[Cite as *State v. Glasser*, 2012-Ohio-3265.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
ATHENS COUNTY

| | | |
|---|---|---|
| STATE OF OHIO, | : | Case No. 11CA11 |
| | : | |
| Plaintiff-Appellee, | : | |
| | : | DECISION AND |
| v. | : | JUDGMENT ENTRY |
| | : | |
| TERRENCE GLASSER, | : | |
| | : | **RELEASED: 06/27/12** |
| Defendant-Appellant. | : | |

_____
APPEARANCES:

Timothy Young, State Public Defender, and Stephen P. Hardwick, Assistant State Public Defender, Columbus, Ohio, for appellant.

Keller J. Blackburn, Athens County Prosecutor, Athens, Ohio, for appellee.
_____
Harsha, J.

{¶1}   Terrence Glasser appeals his convictions for two counts of aggravated arson for setting fire to his home and an outbuilding on his property.  Glasser contends that although the trial court gave the jury legally correct instructions on the mens rea and causation elements for aggravated arson, the wording or formatting of the causation instructions undercut the State's burden to prove the required mens rea. Specifically, he complains about the wording indicating he is responsible for "the natural and foreseeable consequences" of his conduct.  After reviewing the charge in its entirety, we conclude that the trial court's causation instruction did not dilute the mens rea element of "knowingly," which the jury had to find to convict Glasser.

{¶2}   Next, Glasser complains that when he testified at trial, the court incorrectly made him invoke the marital communications privilege in the jury's presence.  We agree that the trial court erred because the jury could improperly infer that Glasser was hiding

incriminating statements he made to his wife.  However, the error was harmless given the substantial other evidence of his guilt.

{¶3}   Glasser also contends that the trial court erred when it conducted part of a hearing on the admission of the State's trial exhibits outside of his presence.  Even if we assume defense counsel did not waive Glasser's right to be present, Glasser cannot establish plain error.  Glasser's counsel was at the hearing, and deciding whether to contest the admissibility of exhibits is a legal issue within the professional judgment of counsel.  Glasser does not argue that his counsel rendered ineffective assistance and has not demonstrated that the outcome of the trial would have been different but for his absence.  Accordingly, we affirm the trial court's judgment.

## I.  Facts

{¶4}   A grand jury indicted Glasser on two counts of aggravated arson.  He pleaded not guilty to the charges, and the matter proceeded to a jury trial where although several witnesses testified, only a summary of the evidence follows.

{¶5}   Roman Brandau, a fire and explosion investigator for the Ohio State Fire Marshall's Office, testified that he investigated the incident on the Glassers' property.  His investigation revealed that two fires had been intentionally set – one in an outbuilding and one in a bedroom.  When he interviewed Glasser at the hospital, Brandau noticed a strong odor of petroleum distillate on him.  Glasser agreed to give Brandau his clothing for analysis.  By the time Brandau retrieved fire debris bags from his car, Glasser placed his shirt, jeans, and shoes in a bag.  Brandau also found a safety cap/lid and a handkerchief in the bag.  Later testing revealed that all the items had medium petroleum distillate on them, which could be from paint thinner, charcoal

starter, or lamp oil.  Brandau also collected newspaper remnants from the floor near a side door because he thought the paper might have been used to accelerate the fire's movement from the outbuilding to the house.  The remnants tested positive for medium isoparaffinic product, which could be from mineral spirits or lamp oil.

{¶6}    Brandau and another investigator interviewed Glasser again two days later at Appalachian Behavioral Health Care (ABH), a state psychiatric hospital.  During the interview Glasser claimed that he did not remember starting the fire in the outbuilding.  But later, he said:  "To the best … to the best of my * * * recollection, and I'm not 100% sure if it's correct is I just wadded up a bunch of papers and lit'em on fire." He did this in the "very back" of the outbuilding.  Glasser told investigators he used a Bic lighter he got from a toolbox and newspaper already in the outbuilding.  Glasser put an "X" on a diagram of the outbuilding to mark the location where he lit the papers on fire. Although investigators did not tell Glasser where the fire originated, he marked the exact area of origin investigators found – the southeast corner of the building.  He also acknowledged that he probably put newspaper by the side door to move the fire from the outbuilding to the house.  Glasser admitted that the thought of setting fire to the house crossed his mind but was "99% sure" he did not set the house on fire.  Glasser acknowledged that he thought he wadded up newspaper inside the house but could not remember where he placed it.  Brandau admitted that during the interview Glasser had a visible injury on his forehead and complained that his head hurt several times.

{¶7}    Richard Casto, owner and operator of a fire investigation firm, testified that State Farm hired him to evaluate the Glassers' property.  Casto concluded someone intentionally set two fires on the property – one in the outbuilding and one in a bedroom.

Casto found a "combustible trailer" in the house, i.e., newspapers and other papers laid through a hallway into the bedroom to unnaturally move the fire from one area to another. He knew the papers were on the floor before the fire because they were adhered to the carpet, and "you could peel it up and the carpet was pristine below it * * *."

{¶8} A.G., Glasser's seven-year old son, testified that before his dad walked him to school the morning of the fires he was "acting kind of funny. And he had this big chunk tooken out of his head. * * * And he was laying papers down." A.G. explained that Glasser was "wadding [papers] up a little bit and putting them down." He saw Glasser do this by a side door of the house and near a shelf by the front door. Robin Warren, a Nelsonville-York City Schools bus driver, testified that when she saw Glasser walking his son to school that day, he was "like staggering like he was, I don't know, like he was hurt or something because his face was all messed up." According to Warren, his face was red, and he had a cut on his nose.

{¶9} Margaret Whitmore, the Glassers' next door neighbor, testified that the fire from the Glassers' outbuilding spread to her attached garage while she was home. Whitmore's daughter, Millie Gwilym, testified that when she saw the Glassers' outbuilding engulfed in flames, she told her mother and ran to the Glassers' front door. She found it ajar and yelled to get the attention of any occupants. After getting no response, she went inside and continued to yell. She did not see any smoke in the house. Glasser entered the living room and seemed angry that Gwilym had come inside. She told him about the fire, and he said "the fire department's been called." Gwilym turned and left, thinking he would follow her outside. Instead, he shut and

locked the door behind her.  Later, Gwilym saw smoke coming from the side of the Glassers' house opposite from the outbuilding/her mother's garage.  A group of people broke into the home and brought Glasser out.

{¶10}  Elizabeth Glasser, the appellant's wife, testified that she was at work during the fires.  Elizabeth claimed that she "knew immediately that [her husband] was the one that set the house on fire because of the previous way he had treated [her]."  After the incident she filed for divorce.  Elizabeth acknowledged that she received over $100,000 in insurance benefits after the fires.  However, she claimed that her husband set up the policy through his employer, State Farm, and that before the fires she had no idea of its value or that it was only in her name.  Elizabeth testified that she received less than half of the policy's value because of her husband's actions.  Her sister, Angela Taggart, testified that when Glasser was in the hospital after the fires she heard him tell Elizabeth that "we can buy the house [on] Fork Street now[,]" and Elizabeth was "just kind of dazed by that."

{¶11}  Glasser testified that he did not set the fires.  After he walked A.G. to school, he saw smoke coming from the corner of Mrs. Whitmore's house but assumed she was burning trash.  Glasser went home to change for work but before he could someone knocked on the front door.  As he approached the door, a woman came inside.  She told him that his "building was on fire," and he told her to immediately call 911.  When the woman left, Glasser closed the door behind her and locked it "just out of habit."  He looked out a window in the master bathroom to check on Mrs. Whitmore's burn barrel and saw black smoke coming from his outbuilding but no flames.  Glasser went inside the outbuilding but hit a wall of black smoke and started to choke.  He tried

to get out, slipped on something wet, and fell to the floor.  Glasser testified that he thought he hit his head on a weight bench and went unconscious because everything after the fall was "kind of fuzzy," and he could not "remember a hundred percent of everything."  He also scraped his wrist, banged his hip, and injured his shin.  Glasser claimed that when he fell, his jeans, shirt, and shoes came into contact with the wet substance on the floor.  He managed to get back into the house, which was not on fire at that time, and someone helped him out front.  He was taken to the hospital and later moved to ABH.  Glasser admitted that no one ever diagnosed him with a concussion.

{¶12}  Glasser claimed he could not remember much that occurred after the fall. He did not recall talking to Brandau in the hospital and remembered little about his second interview with Brandau and Investigator Stellfox.  Glasser testified that he did not think he was capable of coherently relaying what happened to investigators because he was "very jumbled up on the events" and could not get his thoughts together.  He thought investigators coerced him.  Glasser testified that he had "fallen and taken a blow to the head," and investigators "took advantage" of his state of mind.

{¶13}  In addition, Glasser testified that the cap Brandau found in his bag of clothing looked like the cap from a container of Roundup he used the night before the fires when he tried to spray his driveway for weeds.  Regarding newspaper found in the house, Glasser testified that while remodeling the old garage into a bedroom, he found newspaper in the walls.  However, Glasser acknowledged that he did not know what type of insulation was used in the rest of the walls.  Glasser testified that he had a "bad habit of laying * * * newspapers around the living room" and was picking them up before he walked A.G. to school.  He also claimed the house had newspaper throughout the

ceiling in the kitchen and living room and that he previously removed newspaper from an access to the attic. Glasser denied having financial problems but admitted that he had borrowed money from his wife's parents before. He acknowledged looking at a house on Fork Street but claimed he did not want to buy the house because it was in a flood zone.

{¶14} Glasser offered the jury an alternative theory on how the fires started: a thief started them to conceal his crime. Glasser testified that the day after jury selection and the jury view of his property, he reviewed post-fire photographs and did not see certain items in the outbuilding, like a table saw, toolboxes, and a power washer he borrowed from Pete Taggart. Glasser also testified that his wife submitted an inventory of items lost in the fire to State Farm, which included twenty-six jewelry pieces. Glasser claimed that he did not see any remnants of the jewelry in the post-fire photographs. He did not notice these items missing during the jury view because he "was very upset" at the time. Glasser admitted that he never actually went through the rubble on his property. He testified about other thefts on his property that occurred over a year before the fires. According to Glasser, someone took everything in his wife's car while it sat in the driveway and someone stole a power painter he borrowed.

{¶15} However, during the State's case in rebuttal, Brandau testified that the table saw could be beneath a mass of debris in the outbuilding. In addition, Thomas "Pete" Taggart testified that he saw the power washer he loaned Glasser on the property after the fire.

{¶16} The jury found Glasser guilty on both counts, and this appeal followed.

II. Assignments of Error

**{¶17}** Glasser assigns three errors for our review:

I.      **The trial court erred by giving an instruction that negates the statutory mens rea of "knowing," violating Mr. Glasser's right to require the State to prove all elements of the offense to the jury beyond a reasonable doubt. Fifth and Fourteenth Amendments to the United States Constitution. T.p. Vol. IV, 157-8, 177-8, 216-7.**

II.     **The trial court erred by requiring Mr. Glasser to assert marital privilege in front of the jury. T.p. Vol. IV, 79-81.**

III.    **The trial court erred by holding a hearing on the admission of exhibits outside the defendant's presence. T.p. Vol. IV, 1-6.**

III.  Jury Instructions

**{¶18}** In his first assignment of error, Glasser contends that over his objection, the trial court gave the jury improper instructions. Generally, we use a de novo standard of review to determine whether jury instructions charge on all relevant questions of the law that the evidence supports. *State v. Brown*, 4th Dist. No. 09CA3, 2009-Ohio-5390, ¶ 34. However, the actual wording and format are within the trial court's discretion. *Id.*

**{¶19}** The trial court gave the following jury instruction:

The Defendant is charged in count one with aggravated arson. Before you can find the Defendant guilty of aggravated arson on count one you must find beyond a reasonable doubt that on or about September 13, 2010 in Athens County, Ohio the Defendant by means of fire or explosion knowingly caused physical harm to an occupied structure. A person acts knowingly regardless of his purpose when he is aware that his conduct will probably cause a certain result. A person has knowledge of circumstances when he is aware that such circumstances probably exist. Knowingly means that a person is aware of the existence of the facts and that his acts will probably cause a certain result. Since you cannot look into the mind of another, knowledge is determined from all the facts and circumstances in evidence. You will determine from these facts and circumstances whether there existed at the time in the mind of the Defendant an awareness of the probability that he was causing physical harm to an occupied structure by means of fire or explosion. Cause is an

act or failure to act which in a natural and continuous sequence directly produces the physical harm to the occupied structure and without which it would not have occurred. The Defendant's responsibility is not limited to the immediate or most obvious result of the Defendant's act or failure to act. The Defendant is also responsible for the natural and foreseeable consequences that follow in the ordinary course of events from the act or failure to act.

**{¶20}** Glasser focuses on the court's statements that: "The Defendant's responsibility is not limited to the immediate or most obvious result of the Defendant's act or failure to act. The Defendant is also responsible for the natural and foreseeable consequences that follow in the ordinary course of events from the act or failure to act." Glasser acknowledges that these are correct statements of law but claims that because these statements followed the court's definition of the term "knowingly," the jurors were confused or misled about the required mens rea for aggravated arson and could have convicted him based on "something more akin to recklessness or negligence."

**{¶21}** Because Glasser's argument is essentially that the court erred in the wording or formatting of the instruction, we review this assignment of error under the abuse of discretion standard. The phrase "abuse of discretion" connotes an attitude on the part of the court that is unreasonable, unconscionable, or arbitrary. *State v. Adams*, 62 Ohio St.2d 151, 157, 404 N.E.2d 144 (1980). When applying the abuse of discretion standard, a reviewing court is not free to merely substitute its judgment for that of the trial court. *In re Jane Doe 1*, 57 Ohio St.3d 135, 138, 566 N.E.2d 1181 (1991).

**{¶22}** We understand Glasser's concern. He complains the causation instruction, following upon the heels of the definition of the mens rea of "knowingly," might cause a jury to lose track of the fact that the causation element does not supplant or replace the element of "knowingly," but is an additional element that the State must

prove beyond reasonable doubt.  *See State v. Collier*, 2nd Dist. No. 20131, 2005-Ohio-119, ¶ 20.  However, reviewing courts must consider jury instructions in their entirety.  *State v. Price*, 60 Ohio St.2d 136, 398 N.E.2d 772 (1979), paragraph four of the syllabus.  Here, the trial court specifically told jurors that before they could find Glasser guilty, they had to find "beyond a reasonable doubt that * * * [he] by means of fire or explosion *knowingly caused* physical harm to an occupied structure."  (Emphasis added.)  Then the court gave the jurors extensive instructions on what "knowingly" meant and on what "cause" meant.  Therefore, we conclude that the trial court's causation instruction did not dilute the mens rea element needed to convict Glasser of aggravated arson.  *See State v. Siller*, 8th Dist. No. 80219, 2003-Ohio-1948, ¶ 63.  Accordingly, the trial court did not abuse its discretion in the wording or format of the jury instructions.

{¶23}  Glasser also contends that the prosecutor became confused about the mens rea and causation elements during his closing argument, which "compounded" the trial court's error in the instructions.  However, we already determined that the trial court did not err when it charged the jury.  Moreover, even if the prosecutor made confusing legal statements in his closing, it does not necessarily follow that the jurors utilized an incorrect legal standard.  The court specifically instructed the jury that "*the Court* provides the instructions of law.  It is your sworn duty to accept these instructions and to apply the law as it is given to you."  (Emphasis added.)  To the extent Glasser's argument implies prosecutorial misconduct occurred during closing arguments, he did not separately assign this issue as error, so we do not address it.  App.R. 12(A)(2); App.R. 16(A)(7).  Accordingly, we overrule Glasser's first assignment of error.

IV.  Assertion of the Marital Communications Privilege in the
Jury's Presence

**{¶24}**  In his second assignment of error, Glasser contends that when he testified, the trial court erroneously made him assert R.C. 2945.42's marital communications privilege in the jury's presence.  Glasser argues that his invocation of the privilege had no legitimate evidentiary value and permitted the jury to improperly draw an adverse inference against him.

**{¶25}**  "The admission or exclusion of relevant evidence rests within the sound discretion of the trial court."  *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, 960 N.E.2d 955, ¶ 113, quoting *State v. Sage*, 31 Ohio St.3d 173, 510 N.E.2d 343 (1987), paragraph two of the syllabus.  Evid.R. 401 defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  Under Evid.R. 402, all relevant evidence is admissible except as otherwise provided by law.  Evid.R. 403(A) provides that "[a]lthough relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury."

**{¶26}**  At the start of trial, the court held a hearing outside the jury's presence on the marital communications privilege.  When the hearing concluded, defense counsel informed the court that Glasser intended to assert the privilege, and the court stated that it would not admit conversations between the couple that occurred outside the presence of a competent third person.  When Glasser's wife testified, the jury did not know that he asserted a privilege to limit her testimony.  Later in the trial, the State attempted to argue that Glasser waived the privilege during his direct-examination by commenting

that he told his wife a particular medication made him feel flat and emotionless.  The

court held that Glasser's statement did not constitute a "complete waiver," and the State

could only "ask him about what he said" during his direct-examination.

{¶27} Then the following transpired during Glasser's cross-examination:

[PROSECUTOR]:    In your state of mind on September 13th
did you believe you were having marital problems?

[GLASSER]: Nothing major, no.

[PROSECUTOR]:    Had you and your wife had a lot of one
on one discussions that week?

[GLASSER]: Yes.  And the biggest thing that I had told her was that –

[DEFENSE COUNSEL]:     Objection.

[JUDGE]:      Basis?

[DEFENSE COUNSEL]:     Privilege.

[PROSECUTOR]:    May we approach?

BENCH CONFERENCE

[PROSECUTOR]:    It's his privilege to invoke.  It's his privilege to waive.

[JUDGE]:      He hasn't waived it yet.

[PROSECUTOR]:    He was about to answer a question before the
objection.

[JUDGE]:      His attorney is asserting it for him.

[PROSECUTOR]:    I think he has to assert his privilege.

[DEFENSE COUNSEL]:     I can (inaudible)

[PROSECUTOR]:    You have to assert your own right to remain silent.
We've dealt with that issue several times.  The attorney can't invoke your
rights for you. So if he wishes to testify –

[JUDGE]:      I can ask him if he wishes to assert marital privilege.

[DEFENSE COUNSEL]:     I don't think that should be done in the presence of the jury.

* * *

[JUDGE]:     Alright.  I disagree * * *.  I'll ask him in the presence of the jury.

END OF BENCH CONFERENCE

[JUDGE]:     Mr. Glasser, your counsel has asserted marital privilege for you.  Do you agree with his assertion?

[GLASSER]: Yes sir.

{¶28}  In its appellate brief, the State asserts that "[t]he Defense did ask that [Glasser] be allowed to assert the privilege outside the hearing of the jury, but did not make any objection to the judge asking and defendant asserting his privilege."  This statement implies that we should apply plain error review to this assignment of error.  However, defense counsel clearly stated that he did not believe Glasser should have to invoke the privilege in front of the jury, presumably because it would unfairly prejudice his client.  We do not believe a subsequent objection was necessary to preserve the issue for review.

{¶29}  R.C. 2945.42 provides:  "Husband or wife shall not testify concerning a communication made by one to the other, or act done by either in the presence of the other, during coverture, unless the communication was made or act done in the known presence or hearing of a third person competent to be a witness * * *."  Although neither party raises the issue, the prosecutor's initial question did not implicate the marital communications privilege.  The prosecutor asked Glasser if he and his wife "had a lot of one on one discussions" the week of the fire.  This question required a yes or no

response.  The prosecutor did not ask Glasser to testify about the contents of those discussions (though he likely would have followed up with that question if Glasser responded affirmatively).  Unprompted, Glasser began to discuss the contents of those conversations until his attorney intervened.  Nonetheless, the jury still heard Glasser invoke the privilege, and he claims as a result his credibility suffered.

{¶30}  It is not clear why the trial court insisted that when Glasser testified, he had to invoke the privilege in the jury's presence, particularly considering the court conducted all other discussions on the matter, e.g., Glasser's invocation of the privilege prior to his wife's testimony, outside the jury's hearing.  The only relevance of Glasser's invocation of the privilege is that the jury could infer that Glasser made incriminating statements to his wife and asserted the privilege to hide them from the jury.  However, "[f]or a privilege to have maximum effect, the possibility of prejudice that may arise against the holder must be minimized.  Otherwise the holder may be either intimidated into waiving the privilege, or penalized for exercising the privilege.  The goal is to prevent the jury from treating an exercise of a privilege as the equivalent of evidence against the holder, or in any way drawing an adverse inference from the assertion of a privilege." (Footnote omitted.)  3 Weinstein & Berger, *Weinstein's Federal Evidence*, Section 513.03 (2d Ed.2007).  "If objection to the disclosure of a confidential communication must be made in the presence of the jury * * * the benefit of the privilege is largely lost, because the claim of privilege is unduly stressed before the jury, which, doubtless more often than not, is influenced by a conviction that, had the excluded testimony been admitted, the party who claimed that it was privileged would have been damaged by it."  Annotation, *Right to insist that opponent's claim of privilege shall be*

*made in presence of jury, or to ask him if he is willing to waive privilege*, 144 A.L.R.

1007, 1007 (1943).

**{¶31}** Though not adopted by Congress as a Federal Rule of Evidence, we find

United States Supreme Court Standard 513 a helpful guide in this matter:

> **Standard 513.  Comment Upon or Inference From Claim of Privilege; Instruction.**
>
> (a) Comment or inference not permitted.  The claim of a privilege, whether in the present proceeding or upon a prior occasion, is not a proper subject of comment by judge or counsel.  No inference may be drawn therefrom.
>
> (b) Claiming privilege without knowledge of jury.  In jury cases, proceedings shall be conducted, to the extent practicable, so as to facilitate the making of claims of privilege without the knowledge of the jury.
>
> (c) Jury instruction.  Upon request, any party against whom the jury might draw an adverse inference from a claim of privilege is entitled to an instruction that no inference may be drawn therefrom.

*Weinstein's Federal Evidence*, Section 513App.01.

**{¶32}** Based on these authorities, we conclude that the trial court abused its

discretion under Evid.R. 403(A) when it made Glasser invoke the marital

communications privilege in the jury's presence.  The probative value of the invocation

was slight because the jury could not hear the contents of the privileged

communications to learn whether they were in fact incriminating as opposed to perhaps

just embarrassing to Glasser.  The danger of unfair prejudice was substantial because

the jury could unjustifiably infer that Glasser was hiding evidence of his guilt, lessening if

not destroying the benefit of his privilege.

**{¶33}** Next, we must determine whether the trial court committed reversible

error.  Crim.R. 52(A) provides:  "Any error, defect, irregularity, or variance which does

not affect substantial rights shall be disregarded." "Thus, Crim.R. 52(A) sets forth two requirements that must be satisfied before a reviewing court may correct an alleged error." *State v. Fisher*, 99 Ohio St.3d 127, 2003-Ohio-2761, 789 N.E.2d 222, ¶ 7. First, the court must determine whether an error occurred, i.e., a deviation from a legal rule, which we have already done. *Id.* "Second, the reviewing court must engage in a specific analysis of the trial court record – a so-called 'harmless error' inquiry – to determine whether the error 'affect[ed] substantial rights' of the criminal defendant." *Id.* In other words the error must have been prejudicial, i.e., it must have affected the outcome of the trial. *Id.* The State has the burden of proving the error did not affect the defendant's substantial rights. *State v. Perry*, 101 Ohio St.3d 118, 2004-Ohio-297, 802 N.E.2d 643, ¶ 15. Because the court's violation of Evid.R. 403(A) is a nonconstitutional error, the State can establish the error was harmless by directing us to substantial other evidence to support the verdict. *State v. McNeill,* 83 Ohio St.3d 438, 447, 700 N.E.2d 596 (1998). Here, we conclude that the State has satisfied its burden.

**{¶34}** Glasser did not request nor did the trial court give the jury an instruction that it could not draw an adverse inference from the invocation of the privilege. However, the discussion on privilege that occurred in front of the jury comprises less than half a page of testimony during a four-day trial. Once Glasser asserted the privilege on the stand, the prosecutor did not ask him any other questions that he refused to answer on the basis of privilege. See, by way of contrast, *State v. Dinsio*, 176 Ohio St. 460, 468, 200 N.E.2d 467 (1964) where the Supreme Court of Ohio held that once a witness invoked his right against self-incrimination, the trial court committed prejudicial error when it allowed the prosecutor to continue asking the witness questions

that went unanswered and "placed before the jury innuendo evidence or inferences of evidence which the state could not get before the jury by direct testimony from the witness."

**{¶35}** Moreover, the State presented substantial evidence of Glasser's guilt. The State offered evidence that Glasser intentionally set fire to the outbuilding before he took his son to school and placed newspaper near the house's side door to move the fire from the outbuilding to the house. A.G. saw Glasser wadding up papers before school and putting them in various locations, including by the side door. Brandau collected newspaper remnants by the side door that tested positive for medium isoparaffinic product, which could be from mineral spirits or lamp oil.

**{¶36}** During an interview Glasser claimed that he did not remember starting the fire in the outbuilding. But later, he said: "To the best … to the best of my * * * recollection, and I'm not 100% sure if it's correct is I just wadded up a bunch of papers and lit 'em on fire" in the outbuilding. Glasser told investigators that he used a Bic lighter and newspaper. He marked the exact location where he set the fire on a diagram even though investigators never gave him that information. He also acknowledged that he probably put the newspaper by the side door to move the fire from the outbuilding to the house. And although Glasser attempted to argue at trial that his statements were coerced, nothing in the interview tape suggests investigators coerced him in any way.

**{¶37}** By the time Glasser finished walking A.G. to school, smoke was coming from the outbuilding but the house was not yet on fire, which is presumably why Glasser started a second fire in the bedroom. Glasser did not admit that he set the house fire in his interviews with investigators. However, he acknowledged that he thought of setting

the house on fire and was only "99% sure" he did not set it.

{¶38} Casto testified that the house contained a trail of newspapers and other papers intentionally laid on the floor down a hallway into the bedroom to move the fire through the house. He knew someone put the papers down pre-fire because the carpet beneath them "was pristine." Although Glasser admitted in an interview that he thought he wadded up newspaper inside the house, he made weak efforts at trial to explain its presence on the floor. He tried to attribute its presence to shoddy home construction, i.e., newspaper in the walls, etc. However, even if the walls or ceiling contained newspaper, Glasser failed to explain how it came to form a trail on the carpet before the fire started. And again, A.G. saw Glasser wadding up papers before the fire and putting them in various locations. Glasser tried to explain away this testimony by suggesting A.G. was confused and that he was in fact picking up the papers. However, this testimony does not explain why a trail of papers remained in the hallway.

{¶39} Multiple witnesses testified that Glasser had a chemical odor on his person after the fires. Testing revealed that his clothing and the cap Brandau found with the clothing all contained medium petroleum distillate, which could come from paint thinner, charcoal starter, or lamp oil, i.e., items that could accelerate a fire. Glasser testified that the distillate must have come from the wet substance he fell on in the outbuilding. However, A.G. and Warren observed injuries to Glasser's face when he took A.G. to school, i.e., before the alleged fall.

{¶40} Glasser claimed that he saw smoke in the area of the outbuilding after he walked A.G. to school but was not concerned because he thought Mrs. Whitmore was burning trash. But when Gwilym told him that his "building was on fire," Glasser claimed

he told her to immediately call 911 instead of asking any questions to verify that she had

not just seen smoke in a burn barrel.  Moreover, Gwilym testified that Glasser actually

told her that "the fire department's been called."  Glasser never called the fire

department.

{¶41}  Although Glasser offered the jury alternative theories on who started the

fires, they lacked evidentiary support.  Glasser suggested that a thief started the fires to

conceal his crimes.  However, by Glasser's own testimony, the bedroom fire had to start

after Gwilym notified him about the outbuilding fire.  Yet no one, including Glasser,

testified to seeing anyone suspicious on the property.  Moreover, the fires occurred on

September 13, 2010, but Glasser testified that he did not realize items were missing

from the property until months later on April 27, 2011 – after his trial began.  Glasser

based his claims of missing items solely on post-fire photographs.  However, Mr.

Taggart testified that he saw the power washer Glasser claimed was missing on the

property post-fire.  And Brandau testified that even one of the largest "missing" items –

a table saw – could be under a mass of debris still in the outbuilding.  It stands to

reason that smaller "missing" items, like the toolboxes and jewelry, could also be under

debris or just simply not depicted in the photographs.  The other thefts Glasser testified

to happened over a year before the fires and had no apparent connection to this

incident.

{¶42}  During closing arguments, defense counsel suggested that Glasser's wife

could have hired someone to start the fires to collect money from the insurance policy in

her name.  But no evidence supports this theory either.  Glasser admitted he set up the

policy in his wife's name only.  And the State presented evidence that Glasser set the

fire so the couple could use his wife's insurance proceeds to buy the "Fork Street" house.

**{¶43}** In light of the substantial other evidence of Glasser's guilt, we conclude that the court's error in making him invoke the marital communications privilege in the jury's presence was harmless.

**{¶44}** Glasser also accuses the State of prosecutorial misconduct within his analysis for this assignment of error. Specifically, he argues that the prosecutor insisted that he invoke the privilege in the jury's presence in violation of his rights under the Fifth and Fourteenth Amendments to the United States Constitution. He did not separately assign this issue as error, so we need not address this argument. App.R. 12(A)(2); App.R. 16(A)(7). Nonetheless, as noted above, the prosecutor's question did not implicate the privilege – Glasser's testimony about the content of marital communications was unresponsive to the question at hand. In addition, the prosecutor did not insist that Glasser invoke the privilege in the jury's presence – the trial court did. The prosecutor did not make any comment about whether Glasser needed to invoke the privilege in front of the jury. Accordingly, we overrule the second assignment of error.

### V. Proceedings Outside the Defendant's Presence

**{¶45}** In his third assignment of error, Glasser contends that the trial court erred when it conducted part of a hearing on the admission of the State's exhibits outside his presence, in violation of Crim.R. 43(A) and his constitutional rights. The State argues that defense counsel not only failed to object to Glasser's absence but expressly waived his right to be present. Alternatively, the State claims that Glasser did not suffer any prejudice. Glasser responds that counsel could not waive his right to be present,

counsel did not waive his right even if counsel had the power to do so, and his exclusion from the hearing is per se prejudicial.

**{¶46}** Before the hearing began, the trial court acknowledged that Glasser had not arrived in the courtroom yet. The State asked the court to first admit all the exhibits it believed defense counsel would not object to, i.e., all of the exhibits except #140 – Casto's report. The trial court asked defense counsel: "[A]re you able to respond to this without Mr. Glasser being present?" Counsel responded: "Yes your Honor, I believe so. We have no objection to the exhibits with the exception of #140." Then the attorneys proceeded to argue about the admissibility of that exhibit. Glasser arrived in the middle of these arguments and was present when the court decided to admit only portions of Casto's report.

**{¶47}** We reject Glasser's contention that his attorney could not waive his right to be present at the hearing. *State v. Hale*, 119 Ohio St.3d 118, 2008-Ohio-3426, 892 N.E.2d 864, ¶ 103. We also reject his contention that a defendant's unwaived absence from a proceeding constitutes prejudice per se, i.e., it amounts to a structural error. The Supreme Court of Ohio has reviewed such matters for prejudice. *See Id.*

**{¶48}** Glasser did not object at the trial level to the fact that the court began the hearing without him. Even if we assume that defense counsel's statement did not operate as a waiver of Glasser's right to be present, he cannot demonstrate plain error. "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." Crim.R. 52(B). "A silent defendant has the burden to satisfy the plain-error rule[,] and a reviewing court may consult the whole record when considering the effect of any error on substantial rights." *State v. Davis*,

4th Dist. No. 06CA21, 2007-Ohio-3944, ¶ 22, citing *United States v. Vonn*, 535 U.S. 55, 59, 122 S.Ct. 1043, 152 L.Ed.2d 90 (2002). For a reviewing court to find plain error: 1.) there must be an error, i.e., "a deviation from a legal rule"; 2.) the error must be plain, i.e., "an 'obvious' defect in the trial proceedings"; and 3.) the error must have affected "substantial rights," i.e., it must have affected the outcome of the proceedings. *State v. Barnes*, 94 Ohio St.3d 21, 27, 759 N.E.2d 1240 (2002). Furthermore, the Supreme Court of Ohio has admonished courts that notice of plain error under Crim.R. 52(B) is to be taken "with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *Id.*, quoting *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph three of the syllabus.

**{¶49}** "An accused has a fundamental right to be present at all critical stages of his criminal trial." *Hale*, *supra*, at ¶ 100. "An accused's absence, however, does not necessarily result in prejudicial or constitutional error." *State v. Davis*, 116 Ohio St.3d 404, 2008-Ohio-2, 880 N.E.2d 31, ¶ 90. "[T]he presence of a defendant is a condition of due process to the extent that a fair and just hearing would be thwarted by his absence, *and to that extent only*." (Emphasis sic.) *Hale* at ¶ 100, quoting *Snyder v. Massachusetts*, 291 U.S. 97, 107-108, 54 S.Ct. 330, 78 L.Ed. 674 (1934), *overruled on other grounds by Malloy v. Hogan*, 378 U.S. 1, 17, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964). The question is whether his presence has a "reasonably substantial" relationship to "the fullness of his opportunity to defend against the charge." *Id.*, quoting *Snyder* at 105-106.

**{¶50}** Glasser cannot demonstrate that the outcome of the trial would have been different had he been physically present for the entire hearing. Glasser was

represented by counsel at the hearing and deciding whether to contest the admissibility of exhibits involves legal issues within the professional judgment of counsel.  *See State v. Frazier*, 115 Ohio St.3d 139, 2007-Ohio-5048, 873 N.E.2d 1263, ¶ 142.  Moreover, Glasser does not argue that counsel rendered ineffective assistance.  Glasser has not shown that his absence impaired his opportunity to defend against the charges and therefore cannot demonstrate that his absence affected his substantial rights.  Accordingly, we overrule the third assignment of error.

## VI.  Conclusion

**{¶51}**  Having overruled each of the assignments of error, we affirm the trial court's judgment.

JUDGMENT AFFIRMED.

## JUDGMENT ENTRY

It is ordered that the JUDGMENT IS AFFIRMED and that Appellant shall pay the costs.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Athens County Court of Common Pleas to carry this judgment into execution.

IF A STAY OF EXECUTION OF SENTENCE AND RELEASE UPON BAIL HAS BEEN PREVIOUSLY GRANTED BY THE TRIAL COURT OR THIS COURT, it is temporarily continued for a period not to exceed sixty days upon the bail previously posted. The purpose of a continued stay is to allow Appellant to file with the Supreme Court of Ohio an application for a stay during the pendency of proceedings in that court. If a stay is continued by this entry, it will terminate at the earlier of the expiration of the sixty day period, or the failure of the Appellant to file a notice of appeal with the Supreme Court of Ohio in the forty-five day appeal period pursuant to Rule II, Sec. 2 of the Rules of Practice of the Supreme Court of Ohio. Additionally, if the Supreme Court of Ohio dismisses the appeal prior to expiration of sixty days, the stay will terminate as of the date of such dismissal.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure. Exceptions.

Abele, P.J. & Kline, J.: Concur in Judgment and Opinion.

For the Court

BY: _____
    William H. Harsha, Judge

### NOTICE TO COUNSEL

**Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**